Irving Lang, J.
The defendant, William Maynard, was charged with the crime of murder in the first degree. The first trial of the case resulted in the jury being unable to agree. The second trial was aborted in its early stages upon, a declaration of a mistrial. The third trial resulted in his conviction of the crime of manslaughter in the first degree. The conviction was affirmed by the Appellate Division in a .3 to 2 decision with a strong dissenting opinion (40 AD 2d 779). The case is presently pending before the Court of Appeals.
. The defendant has previously made a series of postconviction, motions before me, which were all denied. The instant motions seek to set aside the judgment of conviction on the grounds of newly discovered evidence (CPL 440.10, subd. 1, par. [g]) and-that the conviction was had in violation of defendant’s constitutional rights urider Brady v. Maryland (373 U. S. 83; CPL 440.10, subd. 1, par. [h]).
The motions revolve around a witness for the prosecution, Michael Febles. Febles was one of three eyewitnesses to the crime. He testified that he saw the defendant and a white companion involved in an argument on West 3rd Street off 6th Avenue with a sailor, Robert Crist, in which the deceased intervened. Shortly thereafter, while in a taxicab on 6th Avenue and West 4th Street, he heard a “blast” and saw the defendant and his companion run away. He gave chase and observed a tan, bag thrown under a car. The bag was later recovered and was- evidence on trial in-connection with the testimony of One *280 Howard Fox, a cab driver, who testified he had driven the defendant and a white companion, who carried a tan bag, to the general area of the crime some hours before. Febles identified the defendant as ‘ ‘ sort of tall ”, “ not very heavily built ’ ’, dark Skinned with “ a slender face ” and “ high cheekbones ”, wearing an “Afro” haircut and about “ 19-20 years old”. Febles later identified the defendant by means of photographs and, a seemingly accidental face-to-face encounter in the courthouse.
The other two eyewitnesses were Robert Crist and Dennis Morris. Crist, who was with the deceased at the time of the shooting, identified the defendant as about 18-22 years old and testified he also viewed photographs of him. There was substantial evidence of the fact Crist was in a state of intoxication at the time of the murder. Morris witnessed the initial argumen and also the shooting. He described the defendant as about five feet, eight inches-six feet tall, medium complexion, well built, with an Afro type haircut, 18-22 years old, and resembling Martin Luther King.
The instant motions initially arose from recent information imparted to this court by defendant’s counsel that sometime about 1954 Febles was hospitalized at Rockland State Hospital for psychiatric disorders. A hearing was ordered to determine if the prosecution was aware of these facts. As a result of this court’s order to provide the defendant with Febles’ criminal record (yellow sheet), it was further discovered that on January 10, 1966, some 15 months prior to the homicide, Febles was arrested on a disorderly conduct charge (former Penal Law, § 722, subd. 3), to wit: that on or about January 9, 1966 and subsequent thereto, at 16 West 10th Street, New York City, Febles did “ring the deponent’s doorbell, having no business thereat, did knock upon and look through the deponent’s window, at which time the defendant stated to deponent ‘ I want to come in, to fuck you, I want to suck you, put my mouth in your vagina. I’ll take your clothes all off and fuck you.’ The defendant then fled.”
This arrest and incident took place in the same police precinct as the homicide. The court records of that arrest indicated that upon Febles’ conviction by way of a plea of guilty, the District Attorney related to the court that the complainant had informed him that she was also subjected to telephone harassments “ not unlike the obscenities mentioned in the affidavit,” which she believed were made by Febles, and that the arresting officer, Holmes, was told by Febles that “ for a long *281 period of time he has been a peeper and that this area is his area for peeping. ’ ’ The court then committed Febles to Bellevue Hospital for psychiatric observation. Upon the sentence proceeding, the record reveals that Febles ’ attorney indicated that Febles would apply for further psychiatric treatment and supervision. Upon such considerations, the court suspended the six-month sentence imposed.
Given these new facts, the scope of the hearing was broadened to include whether the prosecution had knowledge of this incident and the accompanying commitment. The District Attorney was also directed to obtain Febles’ complete records from Bellevue Hospital.
At the hearing, testimony was taken from Febles, his mother, the three chief investigating police officers in the defendant’s case (Lieutenant Stone, Officer Hanast and Officer O’Brien), the arresting officer in the 1966 disorderly conduct conviction (Sergeant Holmes), the complainant in that case, the two trial District Attorneys (Gino Gallina and Stephen Sawyer), and the two defense lawyers on the third trial (Daniel Meyers and Lewis Steel).
Febles testified he told no one, police officer or District Attornew, about his psychiatric history nor the facts of the 1966 disorderly conduct arrest.[1] The two District Attorneys and the three police officers also testified they were not aware of any psychiatric history. As to the 1966 disorderly conduct case, Sergeant Holmes stated that during the early stages of the homicide investigation he saw Febles in the station house and told ‘ ‘ some ’ ’ officers present, although he could not recall any specific person he told, that he had arrested Febles on the disorderly conduct charge and it was ‘ ‘ logical ’ ’ he also told them about the subsequent mental commitment in his case. He stated that he knew all three officers in the homicide investigation. Lieutenant Stone, who was the commanding officer of the Sixth Precinct at the time, stated that he knew about Febles being a “ peeper ” but did not tell anyone else. Patrolmen O’Brien and Hanast stated they knew about Febles disorderly conduct conviction but not the underlying facts.
Testimony was also taken in regard to Febles ’ yellow sheet. While Patrolman Hanast stated he thought he saw a yellow *282 sheet, he did not personally obtain it. Patrolman O’Brien and Sergeant Stone stated they never got a yellow sheet either. The two District Attorneys testified they had no recollection of any yellow sheet for this witness, but Assistant District Attorney Sawyer testified that on the trial he gave the defense a ‘ ‘ piece of paper ’ ’ containing all the information on the yellow sheet which was provided him by the Bureau of Criminal Identification. Defense counsel Meyer testified he examined the ‘ ‘ piece of paper ” and found it lacking in sufficient information to be of value. Steele testified he could not recollect getting the “paper”. Unfortunately that “paper” was not preserved and is not presently available. At the conclusion of the hearing, the District Attorney produced the additional records from Bellevue. These records showed that sometime about August to September, 1970, also at the exact time of the commencement of the third trial, Febles was again psychiatrieally evaluated at Bellevue. These reports further indicate he was receiving in-patient treatment for one or two months in 1968. Further records seem to be unavailable.
It is conceded by all the parties that, had the facts of the 1966 disorderly conduct case been known, Febles ’ entire psychiatric history would have surfaced and been discovered. The direct link to this conviction was the yellow sheet. The determination of these motions, especially the aspect of suppression under Brady v. Maryland (373 U. S. 83, supra) and the aspect of due diligence under newly discovered evidence, makes it incumbent to examine the circumstances that the yellow sheet played in the history of this case.
Prior to and during the course of the third trial, defendant sought discovery of Michael Febles ’ criminal record (yellow sheet) orally and by way of subpoena duces tecum. The District Attorney successfully moved to quash the subpoena duces tecum and no yellow .sheet was ever provided defendant. Instead, the District Attorney indicated he had a communication from the Bureau of Criminal Identification as to the contents of the yellow sheet and provided that information to defendant (immediately prior to Michael Febles’ testimony), informally upon a piece of paper, which, regretfully, was never marked in evidence nor preserved.
The hearing testimony as to the yellow sheet was vague and confusing. Although the prosecutorial team conceded that obtaining a yellow sheet of a witness is standard operating procedure, it would seem that no yellow sheet was actually obtained here. (The Bureau of Criminal Identification folder, upon which *283 all requests for criminal records are noted, indicates the first request for a yellow sheet was in December, 1973, during the course of these proceedings.)
Apart from any Brady or newly discovered evidence consideration, this court finds it difficult to conceive why such a basic and elementary means of preparing a witness for trial was dispensed with in this case. The prosecutor knew that thejvitness had a criminal record but he did not obtain the official police or FBI record which might have revealed, for example, other convictions in this or other jurisdictions. It is difficult to understand why the District Attorney, in such a celebrated and important murder prosecution, would never obtain the criminal record of a most important witness, if only to forestall any surprise impeachment on the trial.
The defendant contends: (1) that the newly discovered evidence of Febles ’ mental history and the underlying facts of his 1966 disorderly conduct conviction require, in and of themselves, a new trial pursuant to GPL 440.10 (subd. 1, par. [g]); and/or (2) that the suppression of this evidence by the prosecution violates constitutional due process under Brady v. Maryland (373 U. S. 83, supra).
The People argue that this evidence is remote, merely relates to the credibility of the witness and is cumulative of former issues, is immaterial, was not suppressed but remained undiscovered by reason of the lack of due diligence on the part of the defendant and,, in any event, is privileged and cannot be a basis of the relief sought.
A motion for a new trial based on newly discovered evidence is a statutory remedy and may be granted only in the sound discretion of the court (People v. Patrick, 182 N. Y. 131).
The present statute, GPL 440.10 (subd. 1, par. [g]), substantially identical to subdivision 7 of section 465 of the former Code of Criminal Procedure, provides a judgment of conviction may be vacated where new evidence has been discovered which could not have been produced by the defendant at the trial even with due diligence on his part, and which is of such a character as to create a probability that, had such evidence been received at trial, the verdict would have been more favorable to the defendant.
The leading case on the issue of newly discovered evidence, People v. Salemi (309 N. Y. 208), sets the criteria for determining the sufficiency of the new evidence as: (1) it must he of such nature as would possibly change the verdict should a new trial be granted; (2) it must have been discovered since the previous *284 trial; (3) it must be of such nature that it could not have been discover before the trial by the exercise of due diligence; (4) it must be material to the issue; (5) it must not be cumulative to the former issue; (6) it must not be impeaching or contradictory of former evidence. The Federal rule (Fed. Rules Grim. Pro., rule 38 [U. S. Code, tit. 18, Appendix]) and cases hold to the same criteria (United States v. Rutkin, 208 F. 2d 647; United States v. Bertone, 249 F. 2d 156; United States v. Robinson, 329 F. Supp. 723).
The motion pursuant to Brady presents the issue of the suppression of evidence favorable to an accused, upon his request, where it is material to guilt or punishment, irrespective of the good or bad faith of the prosecution. (Brady v. Maryland, 373 U. S. 83, supra.)
These motions require us to examine two aspects of the facts: (1) the conduct of the parties; and (2) the nature of the evidence. Newly discovered evidence focuses on the conduct of the defendant — whether he could have discovered the evidence by due diligence. Brady focuses on the conduct of the prosecution : did they, by affirmative conduct, negligence or under the circumstances as viewed by “hindsight” (United States v. Keough, 391 F. 2d 138), prevent the discovery of evidence, irrespective of good or bad faith? The rule of newly discovered evidence sets the strict criteria that the new evidence must be of such character as to create the probability it would have resulted in a more favorable verdict. The evidence is viewed only in context of its effect on the previous outcome of the trial. Brady is not necessarily concerned with the outcome but with the fundamental fairness of the conduct of the trial itself. It may be said that the rule of newly discovered evidence presupposes no suppression and an otherwise fair trial and, but for the new evidence, no further aspects of the trial need be considered. Brady goes to the essence of the procedure which produced the result, namely, was the defendant afforded due process of law in the trial of his case?
While a motion for a new trial based on newly discovered evidence and under Brady, are independent of each other, there is an obvious interplay of the two doctrines in the facts and circumstances of this case.
The issue of remoteness is removed from the case because the long and continuous history of psychiatric treatment and commitment clearly makes Febles ’ mental state highly relevant on the issue of not only his credibility but also his ability to perceive and remember the facts to which he testified.
*285 As to the question of suppression, Michael Fehles’ arrest for disorderly conduct and the homicide occurred in the same police precinct a mere 15 months apart. The officers involved in both cases knew each other. Sergeant Holmes testified he remembered Febles was “ aiding ” in the investigation and imparted his information about him to certain officers present. Lieutenant Stone, directly or indirectly, was aware Febles was a convicted peeping tom. Officers Hanast and O’Brien were aware of the disorderly conduct arrest, and Holmes initially put the question of Febles ’ sexual aberrations into the mainstream of the investigation. It is obvious that, by way of acknowledged procedure of police officers’ imparting information between themselves, these facts filtered down to the officers investigating the homicide. Whether Stone or any other officers on the homicide case intentionally or negligently failed to investigate further is of no matter. They were put on notice and as fact finders they could not take a hear-no-evil, see-no-evil, speak-no-evil attitude toward a potential and subsequently major witness in their case.
The fact that the prosecution may not have been aware of the information known by the police does not neutralize the constitutional aspects of suppression. “ The police are also part of the prosecution, and the taint on the trial is no less if they, rather than the State’s Attorney, were guilty of the nondisclosure.” (Barbee v. Warden, Maryland Penitentiary, 331 F. 2d 842, 846.) The District Attorney has the high duty and heavy responsibility to prepare and present criminal cases. That duty necessarily entails he be charged with the knowledge and conduct of his agents (see United States v. Consolidated Laundries Corp., 291 F. 2d 563 [mishandling of files by department clerks imputed to prosecutor]; Giglio v. United States, 405 U. S. 150 [promise of one District Attorney is controlling on associate District Attorneys] ; People v. Churba, 76 Misc 2d 1028 [loss of evidence by investigators imputed to prosecution]).
Even if we were to give this factor of suppression minimal consideration, the fact remains that the defense specifically and continuously called for the yellow sheet to investigate the underlying facts of the disordely conduct arrest. This 1 ‘ flagging ” of the importance of the yellow sheet to the defense “ impose [d] upon the prosecution a duty to make a careful check of his files ” United States v. Keough, 391 F. 2d 138, 147, supra). Once the District Attorney knows of the defendant’s interest, if he fails to honor this, even in good faith, he has only himself to blame (United States v. Keough, supra, *286 p. 147; United States v. Miller, 411 F. 2d 825, 831). The trial court, too, with almost prophetic insight, noted that if the disorderly conduct resulted from sexual misconduct, he would permit cross-examination under People v. Sorge (301 N. Y. 198). He specifically ordered it be given to the defendant! Although it could have been easily obtained from the Bureau of Criminal Identification, a few blocks from the courthouse, the District Attorney only provided defendant with a “ piece of paper ” the content of which is disputed and unknown.
The mystery of the yellow sheet is further complicated by the District Attorney’s reference to Febles’ conviction of a 1963 disorderly conduct charge, which he stated arose out of “ causing a disturbance or something of the sort ”. Yet the yellow sheet itself does not indicate this arrest resulted in a conviction nor any facts of the. underlying charge. Febles’ yellow sheet, up until this time, states only the following:

How, then, did the District Attorney know that the 1963 case resulted in a conviction unless he had further information? If he had such information as to the 1963 arrest, would it not 'have also been obligatory for him to investigate the facts and disposition of the 1966 arrést?
Further disturbing is that as to another witness, Dennis Morris, the District Attorney revealed that a prior arrest for possession of marijuana was dismissed because a laboratory report indicated the substance was in fact oregano. How is it *287 the District Attorney knew the specifics of a dismissed case of this witness and yet had no knowledge of the facts underlying Febles’ 1966 ease? Obviously he did investigate the criminal background of that witness. This court can only wonder why it was not done with Febles.
It is well recognized that the prosecution has a great advantage over the defendant in the fact-gathering process due to his superior manpower and access, to other law enforcement facilities (see Goldstein, The State And The Accused: Balance of Advantage in Criminal Procedure, 69 Yale L. J. 1149; Matter of Kapatos, 208 F. Supp. 883, 888; Jackson v. Wainwright, 390 F. 2d 288, 294). The District Attorney here failed to utilize his advantage in his behalf and refused the defendant any access to the information at all. The request for the yellow sheet was after all basic and not extraordinary discovery, and this court cannot conceive why it should not have been provided. The defendant’s case was a highly publicized trial based upon a brutal murder. It was the third trial of the case and at issue were charges of prosecutorial misconduct. The District Attorney had an obligation to the court and to the People he represents to leave no reasonable avenue unexplored in the preparation of the case. Given these circumstances, in face of defendant’s persistent demand and the trial court’s order, the question of suppression cannot be permitted to stand or fall on the unknown contents of the “ piece of paper ” provided in lieu of the yellow sheet.
Therefore, by reason of imputation from the police officers’ and the District Attorney’s own affirmative conduct in regard to the yellow sheet, I conclude there was a suppression of the facts of the 1966 disorderly conduct conviction and the psychiatric history of Febles which would have become evident. To label such suppression intentional or negligent is unnecessary. It is enough that the prosecution was the active and effective cause of the nondisclosure of the evidence. If the prosecutor did not erect a barrier to the evidence it certainly enshrouded the information in fog. If such not be a willful suppression, the result was a de facto suppression.
As to the nature of the evidence, were the facts of the sexual basis of the disorderly conduct conviction the only issue here, I might be inclined to agree that such evidence would be merely cumulative of the trial attempt to impeach the witness and not sufficiently material under Brady or the criteria of People v. Salemi (309 N. Y. 208, supra). This would be so even if it advanced a new theory challenging credibility (People v. Mark- *288 man, 15 N. Y. S. 2d 746, 751; but, cf., Davis v. Alaska, 415 U. S. 308). But the quintessential evidence here is the long-standing and on-going mental condition of a major eyewitness, in conjunction with an apparent sexual aberration. This mental condition raises the question of the accurateness, perception, truthfullness and susceptibility to suggestion of Febles as a witness. His capacity to be a witness may even be in question. As our Court of Appeal's recognized in People v. Rensing (14 N Y 2d 210, 213) .evidence of mental illness is a special type of evidence in that it is a fact a jury would be entitled to know to “ assess and evaluate the • testimony given by him and not accept it * * * as the statement of a ‘ normal ’ individual ”. This is especially so where a witness acts normally throughout the trial, and his demeanor in the courtroom and on the witness stand furnishes no basis for inferring that there is “ ‘ something mentally wrong ’ ” with him (p. 214). There was no indication at the trial here that Febles had any psychiatric disorders. His conduct was not extraordinary. During summations, the District Attorney held him out as an ordinary witness. Febles himself hid his mental history. It is well recognized that mistaken identification “ ‘ probably accounts for more miscarriages of justice than any other single factor ’ ” (United States v. Wade, 388 U. S. 218, 229). Of the three eyewitnesses, Febles’ description of the defendant most accurately fit his actual attributes. His testimony remained relatively unimpeached.
In Giglio v. United States (405 U. S. 150, 154, supra), the Supreme Court, quoting Napue v. Illinois (360 U. S. 264), held that when the reliability of a given witness may well be determinative of guilt or innocence, nondisclosure of evidence affecting credibility may justify a new trial. In Moore v. Illinois (408 U. S. 786), while the court found suppressed prior statements of a witness did not “ significantly ” impeach his testimony, it did recognize that substantial impeaching evidence might have that effect. In Levin v. Katzenbach (363 F. 2d 287, 292) the court held that where the suppressed evidence would have tended to impeach the credibility of a “ key ” witness, the “ question is whether this weakening might have led the jury to entertain a reasonable doubt ” as to guilt (see, also, Ann. 34 ALB 3d, Withholding or Suppression of Evidence by Prosecution in Criminal Case as Vitiating Conviction, p. 16, § 5, subd. [b]).
In United States v. Keough (391 F. 2d 138, supra) Judge Friendly classifies the law as to prosecutorial suppression as *289 falling into three basic categories: (1) deliberate bad faith suppression requiring a low degree of prejudice to the defendant; (2) deliberate refusal to honor a request for evidence irrespective of good or bad faith in doing so, which requires a finding of some prejudice; and (3) where suppression was not deliberate and no request made but where hindsight discloses the evidence could have been put to “ not insignificant ” use (which requires a substantially higher probability the evidence would have altered the result).
While this case falls most comfortably into the second category, even if we were to set the standards of the third and “ no-fault ” the suppression, I conclude that the facts of the disorderly conduct conviction in conjunction with Febles ’ psychiatric history bear much more than only on the reliability of his specific testimony but also upon his trustworthiness as a witness per s'e (Simos v. Gray, 356 F. Supp. 265, 270).
Given the imperfection of the other witnesses’ testimony and personal characters, Febles must have played a crucial role in the jury’s verdict. Thus, evidence of his aberrant mental condition is highly material on the question of the defendant’s guilt. Without this evidence, the jury did not have all the facts before them and were effectively misled in evaluating his testimony. (See Juviler, Psychiatric Opinions as to Credibility of Witnesses, A Suggested Approach, 48 Cal. L. Bev. 648, 648-656.) Under the circumstances, the evidence of his mental history could have been put not only to “ not insignificant use ” (United States v. Keough, 391 F. 2d 138, 147, supra) but to most significant use.
Furthermore had the jury known that this major witness had a history of mental problems requiring hospitalization, both at the time of the crime and the trial, together with admitted conduct evidencing sexual degeneracy and perversion, it would have borne heavily upon their consideration of his testimony with a strong possibility that such witness’s testimony might be entirely discounted. The probability of a more favorable verdict, be it minimally a hung jury, would thus be great.
As to the question of due diligence, this issue is somewhat overshadowed by the highly antagonistic atmosphere created by the respective counsel in this case, which at times caused each to diminish their professional responsibilities in favor of overt hostility on a personal level. This unprofessional conduct must be attributed to both sides. However, considering the fact that the defense counsel was moved to trial almost immediately upon being retained, his lack of experience, the *290 extensive preparation and the investigation involved, I cannot conclude that the failure to discover the new evidence here was a result of a “ slovenly preparation for trial ” (Levin v. Katzenbach, 363 F. 2d 287, 294, supra [dissenting opn.]). I have no quarrel with the trial court or the District Attorney in pressing for trial.
Indeed, the constant spectacle of attempts to frustrate the final determinations of cases by stalling, 'blocking, delaying tactics, changing of counsel, frivolous motions and the like is a major blight on our criminal justice system. But where a case such as this is moved for trial with new counsel, who has a short time to prepare properly, it is incumbent upon a prosecutor to make certain that the defendant is provided with all discovery materials to which he is entitled at the earliest possible stage, rather than withholding and impeding access to such information until the last possible moment.
Here, the District Attorney’s parochial insistence on moving to quash the subpoena for the yellow sheet resulted at best in the disclosure of contested information just prior to cross-examination of a key witness with the unfortunate result that vital evidence was not heard or evaluated by trial jury.
The remaining issue is the question of the privileged nature of Febles ’ medical records.
At common law, there was no rule prohibiting the disclosure of communications between physician and patient (Edington v. Aetna Life Ins. Co., 77 N. Y. 564). The privilege is purely a creature of statute (CPLR 4504, made applicable to criminal actions by C'PL 60.10). The purpose of the rule is to protect those who are required to consult physicians from the disclosure of secrets imparted to them, to protect the relationship of patient and physician and to prevent physicians from disclosing information which might result in humiliation, embarrassment or disgrace to patients (People v. Al-Kanani, 33 N Y 2d 260). But the statutory rule of privilege is not so rigid that it will prevent disclosure at any stage of a court proceeding nor regardless of the issues litigated. In People v. Bartholomew (73 Misc 2d 541, 543, 544) while upholding the privilege therein, the court also recognized that the examination of the merits of the issues, “ particularly upon a post-trial motion to set aside a jury verdict ”, may require the “ laying aside the issue of the privileged nature of these reports ”. In People v. Dodge (73 Misc 2d 80, 81) the court, in denying discovery of medical reports because of the privilege, noted “ it is significant that this is a pretrial motion ” and the records were not sought in connection with *291 the issue of guilt or innocence hut merely on the collateral issue of credibility of a witness. We are, of course, concerned here with postconviction motions in a case where the question of privilege was never before an issue. Since the Brady aspect of the motion involves constitutional considerations, the State’s policy interests in protecting the confidentiality of the physician-patient relationship must give way to the determination of the constitutional question. (Cf. Davis v. Alaska, 415 U. S. 308, supra, where the Supreme Court held that a State’s policy interest in protecting the confidentiality of a witness’s juvenile record must yield to an accused’s constitutional right to effectively cross-examine an adverse witness for bias under the confrontation clause of the Sixth Amendment. The court suggested that if a State deems the confidentiality of records so paramount, it should refrain from using that witness to make out its case. “ The State cannot, consistent with the right of confrontation, require the petitioner to bear the full burden of vindicating the State’s interest in the secrecy of * * * records ” [p. 320].) Minimally, then, there is no privilege as to the court, and since privilege must be ultimately decided by the court in any circumstance, I find that, given the nature of the newly discovered evidence aspects of this motion, the need to privilege the medical records does not surpass the crucial need for their disclosure in determining the merits of the relief sought (see People v. Preston, 13 Misc 2d 802, affd. sub nom. Matter of Silver v. Sobel, 7 A D 2d 728; Milano v. State of New York, 44 Misc 2d 290; Juviler, Psychiatric Opinions as to Credibility of Witnesses, supra, pp. 668-669).[2]
The court recognizes that a jury verdict is not to be set aside but for the most compelling reasons. A jury verdict is the most desired, if not perfect, resolution of a case in our criminal justice system. But that verdict, to have any meaning, must be the result of a careful consideration of all the material facts. For the District Attorney to argue that, in a close case such as this, the long, continuous and possibly organic mental condition of a major witness, manifesting itself on at least one occasion in sexually aberrant behavior, is not of such sufficiency as to be required to be considered by the jury, is not reasonable, and reason is the foundation of justice.
The motions for a new trial pursuant to CPL 440.10 (subd. 1, par. [g]) and CPL 440.10 (subd. 1, par. [h]) are granted.

. Hours after his testimony, Febles was arrested by Federal and State authorities for charges involving the sale of guns. This arrest resulted from a joint investigation by Federal authorities and the Rackets Bureau of the Hew York County District Attorney’s office. He has since been indicted on these charges. There is no evidence that the Homicide Bureau knew of this investigation when Febles testified.

. However, the court will withhold turning over these records to the defense and, instead, will seal them and mark them into evidence as a court exhibit in the event of appellate review.