Fuchsberg, J.
(dissenting). The road to justice has been long in this 10-year-old case in which a mother was charged with the killing of her young son and daughter. Yet, I do not think we may say with any conclusiveness of law or fact that the end of that road was properly reached when, without even conducting a hearing, the trial court rejected defendant’s motion for a new trial made on the basis of the affidavit of F. Sutherland Macklem, whose trustworthiness and whose averments have hitherto never been questioned. In the determination of that issue it should be irrelevant that she was twice found guilty by a jury. Her first conviction had to be reversed for jury misconduct; the second was flawed by now conceded trial error. The triumph of justice rests on its ability to overcome such impediments to a just decision.
Rather, as suggested by Justices Rabin and Martuscello at the Appellate Division (48 AD2d 663), the special circumstances here required that there be a plenary hearing as a precondition to the determination of whether the newly discovered evidence would have resulted in a verdict "more favorable to the defendant” (CPL 440.10, subd 1, par [g]). Accordingly, and for the further reasons which follow, I would modify the order and remand for a hearing.
The reversal of defendant’s original conviction of man *421 slaughter in the first degree for the death of her daughter, Alice Marie Crimmins, on the night of July 13, 1965 (33 AD2d 793), was affirmed by us unanimously in an opinion in which we said, with respect to the testimony of Sophie Earomirski concerning certain events which took place at 2 a.m. on July 14, 1965, that "the credibility of her testimony is essential to the prosecution’s case.” (26 NY2d 319, 324.) In contrast, the same opinion assesses the first trial testimony of Joseph Rorech, to whom defendant is unconvincingly alleged to have made an oral confession, as a witness who was "seriously challenged” and "subjected to searching cross-examination” (p 324).
Before retrial, the District Attorney secured a superseding indictment, which, in addition to the manslaughter accusation with respect to the death of her daughter, also charged the defendant with murder in the first degree of her son Edmund Crimmins, Jr. There followed the second conviction, but the Appellate Division reversed and dismissed the Edmund murder count and ordered a new trial on the Alice manslaughter count. (41 AD2d 933.) We affirmed the dismissal, thus terminating the Edmund charge, but, as to so much of the order as related to young Alice’s death, the majority of our court voted to remand the case to the Appellate Division for determination of the facts. (36 NY2d 230.)
The Appellate Division had reversed the second verdict because the trial had been riddled with multiple errors, which it found had deprived the defendant of a fair trial. The majority of our court, though accepting the existence of these errors, denoted them as "harmless” by articulating and applying a rule on the basis of which it determined that "there is no significant probability in the light of the overwhelming proof that, had it not been for the errors which occurred, [the] jury would have acquitted the defendant” (36 NY2d, at p 243) and which it acknowledged was much less demanding than the Federal test under which it suffices that there be (p 241) "a reasonable possibility that the * * * [error] might have contributed to the conviction * * * (Fahy v. Connecticut, 375 U. S. 85, 86).”
It is noteworthy that none of the acknowledged errors involved the testimony of Sophie Earomirski. Instead, by emphasizing its "compelling” nature and that it was the only alleged "eyewitness testimony” (36 NY2d, at p 242), the court made her testimony an error-free cornerstone for its charac *422 terization of the prosecution’s case as "overwhelming”. Indeed, the appraisal of the Earomirski testimony as pivotal was unanimous, for Judge Cooke in his dissent, in which I joined, accurately referred to her as a "major witness”. (36 NY2d, at p 248.) The Appellate Division’s subsequent affirmance on the same facts, since it followed on our constraining decision, of course adds little to our discussion.
Viewed in this frame of reference, the detailed Macklem affidavit clearly goes right to the heart of the case. Significantly, there was proof that the children, one of whose bodies was later found alongside a highway and the other in a vacant lot, shared a room, the door to which was kept locked, after they retired, by means of a hook and eye catch their father had installed to keep them from raiding the refrigerator. The window provided a possible means of street level exit from the room. Mr. Macklem, an electronics scientist whose reliability has gone unchallenged, tells us that after the time when Mrs. Earomirski’s testimony at least tended to establish that the defendant was seen removing the dead body of the child Alice from her home, he picked up two hitchhiking children on a roadway in the vicinity of the Crimmins residence. He adds that their description tallied with that of the Crimmins children in, among other things, their ages, their self-identification as brother and sister, the fact that the boy was the "bigger” of the two and the fact that the girl was referred to by the boy by the similar-sound appellation "my sister” or "Missy”, the latter being the one by which little Alice was in fact called. Mr. Macklem relates, normally enough it seems to me, that he made the association between these two children and the Crimmins children when he read newspaper reports of the case only a few days later.
When scientific rules of probability are applied to the many points of correspondence, including the coincidence of the hour, place, date, age, sex and number of children, the mathematical odds that result so overwhelmingly weigh against the possibility that these were not the Crimmins children that, if the affidavit is taken at face value, it is impermissible to say that such testimony might not have made the difference between a verdict of innocence and one of guilt. If Macklem’s testimony stood up in accordance with his affidavit, it would knock out such a vital part of the underpinning for the denomination of the case presented against the defendant at her second trial as "overwhelming” so that, even allowing for *423 the newly enunciated harmless error doctrine, the so-called "harmless” errors almost automatically would have to be elevated to the status of reversible ones.
This is all the more so since I believe a painstaking analysis of the trial proof left plenty of room to question whether this was an appropriate case to apply the broadened definition of harmless error in the first place. Ready illustration is found in the three items of proof on which the majority here relies so heavily to paint a picture of overwhelming guilt, e.g. the so-called confession to Rorech, the testimony of dust given by Detective Piering and the medical examiner’s testimony concerning what light the autopsy shed on the time of death. Each one but compounds the doubt.
The relationship between Rorech and the defendant appears to have been a most intimate one. But it comes through from the record with crystal clarity that neither the long-standing marital discord which separated her husband and herself or the interest she developed in other men detracted from her devotion as a mother to her two small children and her resolute determination that she continue to have custody of them. It is against that background that we must view Rorech’s testimony that on one overwrought occasion the defendant uttered the words, "Joseph, forgive me, I killed her”. That was the alleged confession. Though Rorech and the defendant were with each other constantly, almost unbelievably he maintained that she, neither on that occasion or any other, ever offered or was questioned by him as to any details. There was no explanation as to how the crime was perpetrated, no excuses or rationalizations for its commission, no justifications to mitigate moral guilt for such an horrendous and unnatural a double infanticide, no remorse, not even any troubled talk. Just the bold statement.
The words of this sparse confession must raise more psychological and factual questions than they answer. Is there anyone with some experience in life who has not witnessed the emotional and verbal self-flagellation of a parent who, no matter how blamelessly, has suffered the death of a child, whether through illness or violence or even suicide, expressed in almost identical language? Further, for about two years after the words were supposed to have been said, Rorech, though himself a suspect, neither in many meetings with the defendant’s then counsel, to whom he had recommended her, nor on his two different Queens County Grand Jury appear *424 anees, or in questioning by the Nassau County police, even once mentioned any such statement. It appeared on the horizon for whatever it was worth only 48 hours before the trial and after he had been supplanted in defendant’s affections by one Anthony Grace and had worked out an immunity arrangement with the prosecution. The recognized need to bolster his testimony indeed appears to have led to one of the trial errors, an improper revelation to the jury of the administration of a sodium pentothal test to the witness, interestingly enough on an occasion before there was any recollection of a confession.
The proof about dust was at least equally vulnerable to attack. In order to controvert any argument that the children had exited through the window, the “prosecuting attorney put on Detective Piering to testify that a chest below the window had an undisturbed film of dust, visible to him when a clean circle was formed upon his removal of a round lamp base. It turned out he could not have so visualized it because the lamp . base had three separate, discrete legs. Having testified that it was only a "faint film” at the first trial two years after his observations, by the second one, when the issue had escalated in importance, he described the chest as "covered” with dust and stated that his recollection on this point was refreshed only two weeks earlier by a review of notes on this matter contained in police records. An examination of the police records and of Piering’s own notes showed they contained no entry of dust whatsoever. Nor was there any such finding of dust in the special report of forensic experts from the police laboratory who promptly made a fine tooth comb examination of the children’s bedroom. No wonder the prosecutor on summation found it necessary to explain, "Now, Piering, he’s no genius. He’s no Ellery Queen”.
So far as the autopsy is concerned, it is claimed that the contents of the daughter’s stomach proved she died sometime between 8:30 and 9:30 p.m., so that she could not have been alive at the time Mrs. Earomirski claims she saw the "bundle”. That operates on the assumption the child’s last meal was taken at about 7:30. The fact is the autopsy proves no such thing. Dr. Grimes, the medical examiner, who first examined the body the next afternoon, did not profess to know when the last meal was taken; he merely testified that from the undigested state of the food she died shortly after ingesting a meal, whenever that was. In fact, since the best, uncon *425 tradicted and most disinterested testimony was that the child last ate at home at 7:30 p.m. and was last known to be alive at 9 p.m., the absence of any evidence of digestion was incompatible with the passage of the hour and a half, since the evidence proved that digestion begins at once and is a continual and progressive process. Furthermore, the contents of the meal she had at home, described to the police by the mother well before there was any autopsy report, varied considerably from the different foods found on the examination and, therefore, suggested that the child might have had another meal at some unknown time and unknown place considerably after the one taken at home. Thus, the autopsy proof, far from concluding the matter, left very much open the question of whether she was alive at the time covered by the Earomirski testimony and, incidentally, would have made the testimony of Mr. Macklem all the more vital.
All this is not to say that Alice Crimmins was not in fact guilty. She may very well have been. But it points up the essentially judgmental and factual nature of the preliminary determinations which have to be passed upon when we apply a broad harmless error rule. And, in accordance with the analogy which the majority, correctly I believe, draws between that rule and the standard for determining when a motion to vacate a judgment upon the ground of newly discovered evidence should be granted, the latter calls for a similarly permissible exercise by us of power to determine whether in a particular judgmental and factual setting there has been an abuse of discretion as a matter of law. In either case that does not mean we are passing on facts as such, but rather considering them to the extent that they are a foundation for the application of law.
I dissented from the "harmless error” decision because, once meaningful error is established, I do not believe that, from the remote fastness of an appellate court, the pulsebeat of the courtroom can be perceived with sufficient reliability to predict whether, when there has been such error, the result would have been affected. Put another way, an appellate court is too different from a lay jury to permit one to substitute for the other. However, accepting that decision as a fait accompli and now acting on constraint of it, I respectfully suggest that, in light of the Macklem affdavit, any argument about harmless error begs the question.
This is not an instance of a quest for a new trial on *426 evidence that was or, by the exercise of due diligence, could have been available to the defendant at an earlier time. Concededly, immediately upon its discovery, defendant moved with great expedition. Nor is this a situation where an investigation by the District Attorney has resulted in the disclosure of even a single collateral fact making the affiant’s assertions suspect. In fact, there is not the slightest suggestion that Mr. Macklem was unwilling to expose his story to interrogation by the People, in either a formal or an informal setting, whether at the initiative of the People or of the defendant. Defendant’s counsel did volunteer to produce him. And the substance of the affidavit, obviously, is not merely cumulative or impeaching in nature.
The fact that Mr. Macklem did not come forward until nearly seven years after the event is not to be blithely ignored. But, besides being a circumstance beyond the control of the defendant, standing alone, especially in a case of the seriousness and complicated litigation history of the one before us, that fact was not enough to allow for the trial court’s rejection of the motion out of hand. The delay merely emphasized the urgent need for the kind of scrutiny afforded only by an adversary hearing, with its opportunity for direct personal confrontation. This is all the more so here since, curiously, Mrs. Earomirski, as to whom both trial records reveal evidence of instability, had herself not come forward as a witness until about two years after the crime. For that matter, as already indicated, that was true of Rorech as well.
Mr. Macklem himself does not leave his delay unexplained. His affidavit tells us the following:
"The first time I realized that these two children were the Crimmins children was when I saw the report in the Thursday edition of the New York Times.
"Because there was no mention in the press of a possible suspect, I refrained from coming forward, because I was terrified that I might be wrongly accused of a crime.
"I was certain that the children were the Crimmins’ children because I left them at 162nd Street; because their ages seemed to coincide with the ages reported in the press, because the children were brother and sister and the brother was bigger.
"I followed the first trial in the newspapers and when I read what was alleged to have happened I then knew that it was *427 impossible. The little girl could not have been killed two to four hours after a 7:30 or 8:00 o’clock meal.
"The girl and boy were very much alive when I left them and Mrs. Earomirski could not have seen what she claimed to have seen at 2:00 a.m. July 14.
"When Mrs. Crimmins was convicted the first time, I talked to my lawyer about the case, pretending that I was discussing it purely as a matter in the news. He said that the conviction would not stand and that she would surely be released on bail shortly.
"The more I thought of the case, the more I convinced myself that she had to be acquitted during the second trial.
"Having kept silent that long, I allowed myself to maintain my silence, particularly because this was not an ordinary public trial, but a brutally publicized trial, and I feared the publicity that would result from any revealed connection with the case.
"When the second trial resulted in a conviction for murder, I could not longer remain silent, but confided in my attorney, and asked him to contact the attorneys for Mrs. Crimmins.”
Though his conduct hardly comports with the civic ideal, an elementary knowledge of human nature makes Mr. Macklem’s actions quite understandable. Hesistation about becoming "involved” often breeds delay, which in turn leads to embarassment at having already delayed so long.
In these circumstances, it appears to me that it was an abuse of discretion as a matter of law not to grant a hearing on the basis of Mr. Macklem’s affidavit. The difference between a determination on papers and one that permits confrontation with a human being is not a slender one and is not to be discounted casually. The appraisal of Mr. Macklem’s affidavit involved an evaluation of his powers of observation, recollection, motivation, intelligence and veracity. Were they all to be assumed the motion should have been granted. If they were not, since no basis for impeachment of any of these subjective qualities was offered by the prosecution, a determination should only have been made after testing the affiant with the aid of tried tools such as cross-examination.
Until today, I thought that we had a reservoir of power to review an abuse of discretion in a criminal case, even though we have exercised it sparingly (People v Slaughter, 37 NY2d 596; People v Welcome, 37 NY2d 811; People v Englese, 7 *428 NY2d 83; Matter of Bojinoff v People, 299 NY 145, 151; People v La Brake, 28 NY2d 625, revg on dissent with additional comments 35 AD2d 631; Cohen and Karger, Powers of the New York Court of Appeals, § 198, p 745 [1952 rev ed]). I agree with the majority that questions of fact may not be reviewed, but whether there has been an abuse of discretion is a question of law, not of fact. It matters not that the discretion which we review necessarily was exercised in a factual setting. And that is so even though we must look at the facts in order to determine whether the discretion was indeed abused. As has been recently said in a somewhat si mi liar context, "more than a merely mechanical categorization between law and fact is merited if this Court is to perform its great function to review.” (People v Santos, 38 NY2d 173, 176.)
Since, in the absence of any enabling statute, the right of appeal to us from a postjudgment application for a new trial based upon freshly discovered evidence did not exist prior to the enactment of the CPL in 1971, with the fullest respect to my colleagues, the prior history which the majority opinion relates is, therefore, hardly relevant. Because there was no right of appeal there was then, a fortiori, also no right of review. Given this fact, a close reading of the cases decided during that period indicates that, when they speak in terms of reviewability, they must be interpreted either as engaging in dicta or as loosely referring to nonreviewability when nonappealability was intended. Indeed, one suspects that such verbal usage had its genesis in the fact that, at that time, postjudgment orders relating to motions on newly discovered evidence were not part of the judgment roll and, accordingly, were not even physically available for "review” (see People v Priori, 163 NY 99, 107-108).
In any event, none of the cases suggest any constitutional limitations on the right of review. And now that the Legislature has granted a right of appeal, the concomitant right to review on such appeal should follow. It hardly seems likely that those who gave birth to the statute intended it to be stillborn. For a statute usually has some purpose or object to accomplish and we are required to so assume (Montgomery v Daniels, 38 NY2d 41).
Significantly, not a single case in our court since the CPL came into effect in 1971 has found an order denying such a motion for new trial nonreviewable here. Indeed, at about the *429 very time the present case was argued, we decided People v Welcome (37 NY2d 811, 812-813, supra), where in reviewing an identical order denying a new trial based upon freshly discovered evidence, we specifically ruled on whether "the Trial Judge abused his discretion in denying the motion without a hearing”. Similarly, in People v Slaughter (37 NY2d 596, supra), as a fair reading of its opinion makes clear, we again exercised the power to review. The importation pro hac vice of a possible rationale not there expressed does not detract from our point.
Furthermore, CPL 440.10 makes no distinction between posttrial, postjudgment motions, irrespective of whether they are based on newly discovered evidence or not. It also makes no special distinction for cases that, before 1971, fell within the traditional scope of the common-law writ of coram nobis, which is now embraced within the same statutory scheme that applies to all discretionary postjudgment motions. There is no reason now, on the basis of a history whose premise is gone, to carve out an exception for motions on the basis of newly discovered evidence.
In reviewing whether discretion has here been abused it is well also to consider that legislative changes have relaxed the statutory standard for a hearing. So the new evidence must now be only "of such character as to create a probability that had such evidence been received at the trial the verdict would have been more favorable to the defendant.” (CPL 440.10, subd 1, par [g]; People v Maynard, 80 Misc 2d 279, 283-284; see, also, 6 Zett, New York Criminal Practice, par 50.3, subd [1], par [g]; cf. ABA Project on Minimum Standards for Criminal Justice, Standards Relating to Post Conviction Remedies, § 2.1, subd [a], par [v]; Uniform Post Conviction Procedure Act, § 1, subd a, par [4]; Kyle v United States, 297 F2d 507, 514.) The support for the motion here met all the cited standards.
In People v Rensing (14 NY2d 210, 214), after sentencing it was disclosed that Rensing’s codefendant, who gave damaging testimony against him at trial, was insane at the time and had a long history of mental illness. Despite overwhelming evidence of guilt, including a confession, our court reversed Rensing’s conviction and ordered a new trial without a hearing. Judge (later Chief Judge) Fuld went on to distinguish People v Salemi (309 NY 208), on which the majority here relies, noting "that the matter relied upon by Salemi for a new trial 'was not new matter at all, but had been before the *430 court and jury on the main trial’ (309 N.Y., at p. 212).” (14 NY2d, p 214.) True, the reversal in that case took place in a capital case, where we have the power to review the facts as such, but it appears to me that this should have no bearing on the threshold question, raised by a motion for a new trial based on newly-discovered evidence, as to whether a hearing to develop facts should be held in the first place. (Cf. People v Ledwon, 153 NY 10; People v Silver, 33 NY2d 475.)
Therefore, while I am in accord with the majority on the separate matter raised by the Feldman affidavits, I conclude that the failure to order at least a hearing on the Macklem affidavit, which stands uncontradicted and unimpeached, was an abuse of discretion as a matter of law and, accordingly, I would so modify .the order of the Appellate Division.
Judges Jasen, Gabrielli, Jones and Wachtler concur with Chief Judge Breitel; Judge Cooke concurs in a separate opinion; Judge Fuchsberg dissents and votes to modify in another separate opinion.
Order affirmed.