OPINION OF THE COURT
Robert H. Wagner, J.
The issue raised by this motion to confirm an arbitrator’s award exonerating an employee of the Newark Developmental Center of charges of slapping one resident and of injuring another without recording the latter injury or insuring that the person injured received proper medical treatment, may be stated quite simply. Was the arbitrator in this case guilty of misconduct in refusing to permit the resident witness to testify in a disciplinary proceeding on requirement that first the respondent, Newark Develop *231 mental Center, make available to the petitioners the hospital and medical records of the resident witness?
Underlying the stated issue in this case, however, is a far more fundamental issue involving the right of any person to be treated with dignity and understanding, to be accorded the presumption of competency and to be given the opportunity to demonstrate his or her ability to function as a full member of our society.
I hold that the arbitrator was guilty of misconduct and deny the motion to confirm the arbitrator's award.
The facts, insofar as they pertain to this motion, are not in dispute and may be stated as follows:
On March 11, 1979, petitioner, Wanda Taft, a mental hygiene therapy aide, an employee of the New York State Office of Mental Retardation and Developmental Disabilities, was suspended without pay from her duties at the Newark Developmental Center.
On March 13, 1979, the petitioner was served with a notice of discipline charging her with acts of misconduct or incompetency in that:
“1. On January 22, 1979, you slapped resident, Sarah N__
“2. On March 1, 1979, you pushed resident Kathleen K-'s wheelchair into a door casing causing injury to the resident.
“3. On February 21, 1979, you were informed that resident, Kathleen K___ had been injured. You did not record that injury or insure that she received proper medical attention.
“4. On March 1, 1979, you were informed that resident Kathleen K_had been injured. You did not record that injury or insure that she received proper medical attention.
“5. On March 2, 1979, you were informed that resident Kathleen K_had been injured. You did not record that injury or insure that she received proper medical attention.”
Pursuant to article 33 of the collective bargaining agree *232 ment between the State of New York and the Civil Service Employees Association, Inc., Institutional Services Unit, the petitioner objected to the imposition of the proposed penalty and the matter was submitted to arbitration.
The arbitration hearing began on April 26,1979. During ■the arbitration hearing, the State attempted to call a psychiatrist employed by the Newark Developmental Center to testify as to the present mental status of Kathleen K and her ability to testify.
The petitioners’ attorney requested that the State disclose the resident’s medical record. The State objected to the disclosure of records on the ground of confidentiality under section 33.13 of the New York State Mental Hygiene Law, and subsequently withdrew the offer of any testimony of the psychiatrist.
The State requested that the resident be called to testify and if the issue of competency could not be determined by the arbitrator, it proposed to renew its offer of the testimony of the psychiatrist.
The attorney for the petitioner claimed an absolute right to inspect the resident’s medical records.
On August 3, 1979, the arbitrator rendered an interim decision precluding the resident from testifying unless the employer made available the medical record of the resident.
After precluding the testimony of the resident witness, the arbitrator on September 26, 1979, found the petitioner “Not Guilty” of charges one and two of the notice of discipline and ordered reinstatement with full back pay and benefits except for 90 work days.
One can sympathize with the plight of an arbitrator who is called upon to hear the testimony of a mentally disabled person and undertakes the responsibility, of determining the credibility to be ascribed to that testimony. However, the problems which he may anticipate cannot, as a matter of law, form the basis for a decision absolute by him to refrain from hearing the proffered testimony.
In the first place there is a strong presumption that any person has the capacity to testify. The Court of Appeals has made clear the principles which govern the taking of *233 testimony of one who is alleged to be mentally disabled: “The mere fact that one is insane or mentally ill does not per se disqualify him from testifying. He may give evidence, provided only that he has sufficient intelligence to understand the nature of an oath and to give a reasonably accurate account of what he has seen and heard vis-a-vis the subject about which he is interrogated. (See Barker v. Washburn, 200 N. Y. 280, 283; Aguilar v. State of New York, 279 App. Div. 103, 104; District of Columbia v. Armes, 107 U. S. 519, 521.) The capacity of a person to be a witness is presumed and, if objection is made that he is incompetent, it is for the judge, in the exercise of his discretion, to determine his mental capacity to testify. (See People v. Washer, 196 N.Y. 104, 109-110; Aguilar v. State of New York, 279 App. Div. 103, 104-105, supra; Ellarson v. Ellarson, 198 App. Div. 103, 106; see, also, 2 Wigmore Evidence [3d ed, 1940], §§478, 487.) ‘We know both as a matter of definition and of observation’, the court declared in the Barker case (200 N.Y. 280, 283, supra), ‘that a person who would be judicially declared incompetent and unable to manage his affairs might nevertheless possess sufficient intelligence to be truthful and to describe simple occurrences as they were.’ ” (People v Rensing, 14 NY2d 210, 213.)
The Court of Appeals explored the issue further in Matter of Brown v Ristich (36 NY2d 183). Here, a hearing officer in a disciplinary proceeding at Willowbrook State Hospital for the Mentally Retarded, conducted voir dire of the patient resident and took testimony from a psychologist as to her ability to respond trúthfully.* The court concluded:
“Certainly, an adverse party may put competency in issue and in such a case the matter is addressed solely to the discretion of the hearing officer who may examine the witness about to testify and any other person who can establish the mental capacity of the witness (Aguilar v. State *234 of New York, 279 App. Div. 103,105; cf. District of Columbia v. Armes, 107 U. S. 519, 522)” (p 188).
“We today hold that in an administrative proceeding such as this where the administration of an oath would be unavailing for the purpose for which an oath is normally administered, unsworn testimony may be received provided a sufficient foundation exists to support the hearing officer’s determination that the witness possesses rudimentary testimonial capacity” (p 190).
Thus, the issue for the arbitrator is to determine the competency of the witness to testify, that is, to give testimony which, however simple in structure and content, is related to reality, that is, is oriented to time and place, is expressive in a factual way and is reasonably likely to be credible. The issue is not competency in the sense that we relate the term to psychosis or insanity or even the competency to manage one’s affairs. To assist him in his initial determination of the competency of the witness to testify, the hearing officer would need the witness before him.
As the Court of Appeals pointed out in the Brown case, he may use the device of voir dire to test the ability of the person to understand simple questions, to give direct and responsive answers and to demonstrate the degree of verbal competence required to answer simple questions. There would need to be a showing of understanding on the part of the witness of the meaning of truthfulness and a respect for it. Counsel could assist in the voir dire.
The psychiatrist, whose testimony the arbitrator here, also rejected, might provide helpful insight as to the ability of the witness to comprehend relationships and ability to relate happenings in a meaningful and truthful way. Since the psychiatrist would be giving opinion testimony as to the present competence of the witness to testify, there should be no need for counsel to search the patient’s past medical records. The tests and examinations conducted by the psychiatrist in preparation for testimony as well as anything else upon which he were to base his opinion, could not reasonably be withheld under any cloak of privilege (CPLR 4515; Richardson, Evidence [10th ed], §§ 369, 370, pp 345-346).
*235 The arbitrator, in his interim opinion and award at page 5, recognizes the right of the resident patient to provide testimony, for he quotes from the Memorandum to Panel Arbitrators of the State, CSEA and AFSCME Council 82, as follows: “In the context of State service it may be necessary to call residents of mental institutions, drug addicts, juvenile delinquents, and convicted felons and these may be the only witnesses to an event. These witnesses are not entitled to be believed simply because of their sympathy with their plight. On the other hand, their testimony cannot be disregarded merely because they are under a disability.” (Emphasis added.)
Thus, in fairness to the Director of the Newark Developmental Center, as respondent, the opportunity should have been offered to him to place both the resident witness and the psychiatrist on the stand and attempt to demonstrate that the witness was competent to testify.
The court may confirm the award of the arbitrator or vacate or modify it pursuant to CPLR 7510 and 7511 and the case law pertinent to them.
While it is recognized that an arbitration award may not be vacated for errors of law or fact, or even misconstruction of basic rules of law (Matter of Sprinzen Nomberg], 46 NY2d 623; Rochester City School Dist. v Rochester Teachers Assn., 41 NY2d 578; Matter of Associated Teachers of Hungtington v Board of Educ., 33 NY2d 229; Matter of Raisler Corp. New York City Housing Auth.], 32 NY2d 274), an arbitrator’s award may be vacated where the misconduct is fundamental to the ability of the arbitrator to achieve rudimentary fairness in arriving at his decision.
As the Court of Appeals stated in Professional Staff Congresscuny v Board of Higher Educ. (39 NY2d 319, 323): “An arbitrator’s award, however, may be vacated for prejudicial misconduct by the arbitrator (CPLR 7511 subd [b], par 1, cl [i]). One form of misconduct is the refusal to hear pertinent and material evidence (e.g., Gervant v New England Fire Ins. Co., 306 NY 393, 400 * * *).”
Building on the reasoning of the Court of Appeals as *236 cited above, the Appellate Division, Second Department, elaborated as follows: “There is a distinction between an arbitrator’s mistake of fact or law, in general (see Matter of Schine Enterprises [Real Estate Portfolio of N. Y.], 26 NY2d 799) and a statement made by the arbitrator which is a direct cause of the parties’ not offering competent and material evidence. The latter constitutes an exclusion of evidence which, although more subtle, is just as prejudicially effective as a specific ruling made by an arbitrator that evidence, formally proffered, is to be excluded.” (Matter of Lewis v County of Suffolk, 70 AD2d 107, 112.)
However, the petitioners assert that not only do they need the patient’s medical record to challenge her testimonial capacity but also to impeach her credibility. The respondent, in resisting, relies on two statutes:
1. CPLR 4504 (subd [a]) :
“§ 4504. Physicians, dentist and nurse.
“(a) Confidential information privileged. Unless the patient waives the privilege, a person authorized to practice medicine, registered professional nursing, licensed practical nursing or dentistry shall not be allowed to disclose any information which he acquired in attending a patient in a professional capacity, and which was necessary to enable him to act in that capacity. The relationship of a physician and patient shall exist between a medical corporation, as defined in article forty-four of the public health law, a professional service corporation organized under article fifteen of the business corporation law to practice medicine, and the patients to whom they respectively render professional medical services.”
2. Subdivisions (a) and (c) of section 33.13 of the Mental Hygiene Law:
“§ 33.13 Clinical records; confidentiality
“(a) A clinical record for each patient shall be maintained at each facility. The record shall contain information on all matters relating to the admission, legal status, care, and treatment of the patient and shall include all pertinent documents relating to the patient. The commissioner, by regulation, shall determine the scope and method of re *237 cording information, including data pertaining to admission, legal matters affecting the patient, records and notation of course of care and treatment, therapies, restrictions on patient’s rights, periodic examinations, and such other information as he may require.
* * *
“(c) Such information about patients reported to the department, including the identification of patients, and clinical records at department facilities shall not be a public record and shall not be released by the department or its facilities to any person or agency outside of the department except as follows:
“1. pursuant to an order of a court of record.”
The privilege of confidentiality belongs to the patient and may not be waived by the physician or the State (Matter of Warrington [State of New York], 303 NY 129; People v Dodge, 73 Misc 2d 80). As Justice Dillon pointed out in Perry v Fiumano (61 AD2d 512, 519, 517), “these privileges may not cavalierly be ignored or lightly cast aside” and that any waiver or suspension of them constitutes “a drastic remedy” for which the reasons to invoke must be substantive in nature.
Certainly, it is difficult to perceive the need for the petitioners to explore the patient’s record of past treatment and all other matters in the file in order to contest her ability to perceive, remember and narrate events. Simple questions to be asked on voir dire come to mind. How old are you? Where do you live? With whom do you live? What did you eat for breakfast — or dinner? Where do you sleep? Can you describe the room? What did you do yesterday? Can you remember an activity or party and tell us about it? Do you have a job? Do you go to school? Do you play any games? Who do you work with — go to school with —play games with? Can you describe your work — your school — a game? Who is your supervisor? Do you have rules on the job or in the school or residence? What are they? Do you know the petitioner-employee (name) in this case? How do you know this person? Do you know what we mean by tell the truth — to lie?
*238 A little research into the routine of the institution and the happenings of the past few weeks would form the basis for questions concerning events of possible knowledge to the resident and the answers by which the arbitrator could make judgment. The questions could increase with complexity as ability to answer became apparent.
The petitioners do not draw the disinction but, there may be reason for their obtaining some part or all of the patient’s institutional record for the purpose of impeaching the credibility (as opposed to capacity to testify) of the resident witness or for other reasons in connection with preparation of the case.
The respondent does not argue that the records are locked and the key thrown away. They point out that by statute and good reason the key is in the hands of a Judge of a court of record and not with the arbitrator. In truth, they cannot argue with the policy expressed in CPLR 3101 (subd [a]) that, “[tjhere shall be full disclosure of all evidence material and necessary in the prosecution or defense of an action”. The provision of CPLR 3102 (subd [f]) reinforces the need, however, for any request in such a case as this to be made to a court of record. The resident whose records are desired is a nonparty and should be accorded the rights of any nonparty to disclose only upon court order. (See Mayer v Albany Med. Center Hosp., 37 AD2d 1011, in which the court selectively opened a non-party patient’s hospital record as need required.)
A casual reading of the various cases in which privileged material has been made available over objection by a party, a physician or other professional or of the patient or client, might give the impression that there is little consistency in reason or result. A more careful reading requires, however, an appreciation for the basic consistency shown and the genuine concern expressed for the rights of the person seeking disclosure as well as the rights of those statutorily protected.
In all of the cases cited to this court there was express or implied recognition of the statutory mandate that the privilege be suspended only by order of a court of record upon proper motion to all concerned. The decision of the *239 courts to suspend the privilege has been made easier when the person seeking to enforce the privilege is a party to the proceeding and has placed his or her competency in issue. CPLR 3121 makes specific provision for the physical, mental or blood examination of a party and the obtaining of hospital records and reports of examining physicians in an action in which “the mental or physical condition * * * of a party, or of an agent, employee or person in the custody or under the legal control of a party, is in controversy”.
Koump v Smith (25 NY2d 287) involved a party to a personal injury suit seeking disclosure of medical records of the defendant. The Court of Appeals stated at page 294: “We hold, therefore, that by bringing or defending a personal injury action in which mental or physical condition is affirmatively put in issue, a party waives the privilege.” It went on to caution, however, “We do not hold that the privilege is waived whenever a party defends an action in which his mental or physical condition is in controversy. The rule laid down today is limited to cases in which a defendant affirmatively asserts the condition either by way of counterclaim or to excuse the conduct complained of by the plaintiff. Thus in the instant case where defendant has simply denied the allegation of the complaint, the privilege should be recognized (cf. Steinbrecher v. Wapnick, 244 NY 2d 354).”
I point out that in the Koump case the plaintiff’s professed need for the defendant’s medical history was primarily related to his competency as a driver and otherwise to impeach his testimony rather than to test his capacity to testify. The request for the disclosure was made to a court of record.
Similarly, to take another example, the Appellate Division, Fourth Department, in Perry v Fiumano (61 AD2d 512, supra), was asked to suspend the privilege of confidentiality asserted by a respondent in a custody proceeding. Here the issue of competency had to concern the competency of the respondent to parent as opposed to any competency to testify. It was asserted by the petitioner that the records requested would bear on that issue central to the case. The court pointed out that there should be careful consideration *240 to insure that the requested records and information be truly relevant to the issues in the case and genuinely needed by the party seeking them, although upon a proper showing they could be obtained.
In Matter of Do Vidio v Do Vidio (56 Misc 2d 79, 81), Justice Schnepp, then a Family Court Judge, while admitting that under some circumstances a party to a custody proceeding might obtain medical and hospital records of the opposing party, denied the request stating: “These records will not disclose the present mental condition of the respondent, and would be inadmissible at a trial unless related to her present mental condition. (O'Leary v. Sealey, 50 Misc 2d 658.) The materality of these records must be based upon a showing reflecting a relationship between her past and present mental condition, and the necessity of the drawing by a qualified physician upon the information contained in such records in arriving at a diagnosis of her present condition and in making a prognosis. (Constantine v. Diello, 24 AD 2d 821.)”
The much more difficult situation arises where the request is made for the disclosure of the medical and hospital records of a witness who is a nonparty to a proceeding and the party seeking disclosure is under charges affecting his employment or reputation.
Petitioners in this case rely heavily upon Matter of Camacho v Iafrate (66 AD2d 799); Matter of Civil Serv. Employees Assn. (Director, Manhattan Psychiatric Center) (72 AD2d 526), and Matter of Bremiller v Miller (79 Misc 2d 244). Cases involving witnesses to crimes whose mental condition is alleged to have affected their testimony include People v Lowe (96 Misc 2d 33) and People v Maynard (80 Misc 2d 279).
One can perhaps distinguish the Camacho case because the patient at the psychiatric center, in addition to being involved in the arbitration proceeding, apparently was a complaining witness in a criminal proceeding against Camacho and thus, it may be said that the witness himself put his mental condition in controversy. More accurately the case should stand for the proposition that the petitioner having applied to the Supreme Court for the right to. inspect *241 records of the patient, under the circumstances, that court’s determination that the patient’s records be disclosed was affirmed. The language at the Supreme Court level in terms of patient waiver seems unfortunate but the distinction drawn by the Justice between confidential and nonconfidential material in the record was well taken. His concern that the institution not hide evidence favorable to it under the cloak of the patient’s privilege was proper.
The Matter of Civil Serv. Employees Assn. (Director, Manhattan Psychiatric Center) (72 AD2d 526, supra) the so-called Bell case, also concerned an employee under charges of misconduct. The only eyewitness was a mental patient at the center and another mental patient. The employee, Bell, subpoenaed their clinical records which were ordered by a Justice of the Supreme Court. The psychiatric center did not contest the subpoena by motion to quash, although the arbitrator granted an adjournment to enable it to do so. Faced with a subpoena that he could not enforce and a respondent which was adamant in its refusal to seek to invoke any protection which the Supreme Court might give, the arbitrator proceeded without the testimony of the witness and upon application to confirm, the Appellate Division, First Department, reversed the Special Term which had refused to confirm the award. The court stated: “The confidentiality accorded the hospital records of mental patients by the Mental Hygiene Law is not absolute. In a proper case, it must yield to the needs of justice (Matter of Camacho v Iafrate, 66 AD2d 799).”
The case does not so state but it may rest on the assumption that the issue of disclosure had been addressed by the Justice of the Supreme Court when he issued the subpoena for the records and the inaction of the psychiatric center which might be termed acquiescence in law to the result reached.
Matter of Bremiller v Miller (79 Misc 2d 244 supra) concerned the application of a registered nurse, charged with unprofessional conduct, who sought a patient’s hospital record for use in an administrative proceeding. The court granted the request, pointing out (p 246): “the patient’s real identity can be protected and the disclosures limited to *242 the salient facts sufficient to raise the question of the witness’ competency and credibility, should they be germane and necessary.”
Of the criminal cases, People v Lowe (96 Misc 2d 33, supra), points out that where the mental condition of the complainant, who was the sole witness to a crime is such that it may affect the accuracy, perception and comprehension of the testimony, evidence of the condition must be disclosed. Nevertheless, the court refused a motion for a pretrial psychiatric examination of the witness, making the point that in cases in which disclosure of information which would otherwise be privileged, the court is in position to use discretion in granting relief.
People v Maynard (80 Misc 2d 279, supra), granted a motion for a retrial on the ground that the mental condition of a witness for the prosecution (he had been previously hospitalized for a psychiatric disorder), was known to the prosecution and not made available to the defense at trial. The court found at page 291: “the need to privilege the medical records does not surpass the crucial needs for their disclosure in determining the merits of the relief sought.”
All of these cases indicate that upon proper application to a court of record pursuant to the provisions of the Mental Hygiene Law, the CPLR or other statute, a person charged with misconduct affecting livelihood or reputation or charged with crime, may receive portions of records otherwise privileged, of a witness to the events crucial to the issues in the case but that a court of record may exercise discretion in the granting or withholding of such relief.
The court in making its decision may review the patient’s file in camera and preserve so much of the privilege as possible. It may weigh the needs of one party against the rights of another, a process to be preferred to the use of the fiction of waiver to open the entire record.
In justice to the mentally disabled, we should be slow to imply a waiver where none could be given because of the disability itself.
By statute and the significance of the issue to all persons affected, the right to balance the substantive rights of those persons must remain with the court.
*243 In this case the petitioners made no effort to obtain court authority for the records of the resident of the center. The witness and the respondent were deprived of judicial consideration and determination of their rights as well as their responsibilities under the circumstances as they might have been fully revealed.
The award of the arbitrator is hereby vacated and the matter remitted for a new hearing. In order to avoid any appearance of bias on the part of the arbitrator, the matter shall be assigned to a new arbitrator.

 The school psychologist testified that “Beverly does relate to reality. She does know certain things. What is going on around her and she can relate to them. I didn’t find her to be psychotic or irrational. On a very concrete level, she can explain to you she’s at Willowbrook and she has been here for a long time. She is capable of knowing what is going on in a particular setting on a very minimal basis, the same thing with Louise Gruzo” (pp- 186-187).