OPINION OF THE COURT
James G. Starkey, J.
Defendant has moved pursuant to CPL 440.10 for an order vacating his conviction by a jury of murder in the second degree, attempted robbery in the first degree and criminal pos *3 session of a weapon in the second degree. Defendant’s motion is primarily based upon the recantation of a prosecution witness, Ronald Holloway, who asserted that his trial testimony (that defendant had made a jailhouse confession to him) was untrue, that the prosecutor had told him how to testify falsely as to other details and that his trial testimony had falsely omitted reference to promises the prosecution had made in return for his testimony. Mr. Holloway also stated that the prosecutor had withheld from the defense information that Mr. Holloway had undergone psychiatric observation and defendant contends that in doing so, the prosecution violated the rule of Brady v Maryland (373 US 83 [1963]). Finally, he urges that during the trial, it was error for the prosecution to fail to deliver to the defense an audiotape describing the autopsy of the deceased, urging that possession by the Medical Examiner is chargeable to the District Attorney.' A hearing was held on January 22, February 28 and April 18, 1996, during which two witnesses — Mr. Holloway and former Assistant District Attorney Barry Temkin — testified.

Prior Proceedings

Defendant’s conviction concluded his second trial after reversal of his first conviction for murder in the second degree and other crimes. (See, People v Tucker, 182 AD2d 654 [2d Dept 1992].) In reversing that conviction, the Appellate Division, Second Department, stated that "[v]iewing the evidence in the light most favorable to the People, we find that it was legally sufficient to establish the defendant’s guilt beyond a reasonable doubt”. (Supra, at 654-655.) That Court held that reversal was required because the Trial Justice presiding at defendant’s first trial had improperly directed a court officer "to tell the jury to continue deliberations”, thereby delegating a judicial duty to a nonjudicial staff member at a critical stage of the proceedings and in defendant’s absence. (Supra, at 655.)
Prior to the second trial, though no demand for discovery had been made on the prosecution pursuant to CPL 240.20, the defense attorney served and filed a motion pursuant to CPL 240.40 requesting, inter alia, that the prosecution be ordered to: "Set forth whether the identifying witness, or any other People’s witness, has * * * ever received any psychiatric, alcohol or drug treatment and whether it was within a treatment institution and if so, set forth.”
The prosecution did not consent or refer to this request in its answering papers, the court did not rule on it, and neither at *4 torney called the matter to the attention of the court at any time. During the trial neither attorney ever questioned Mr. Holloway concerning the subject of psychiatric treatment or observation.
The retrial commenced on March 15, 1993, and concluded on March 30, 1993, when defendant was again convicted of murder in the second degree. On May 24, 1993, he was sentenced to no less than 20 years to life imprisonment and his appeal to the Appellate Division, Second Department, is pending. At that trial the prosecution presented evidence beyond that offered at the first trial. Specifically, in addition to two eyewitnesses who testified at the first trial, an accomplice — one Michael Hodge — testified that the defendant had participated in a robbery and the homicide which resulted. As noted above, Ronald Holloway also testified for the first time that the defendant had confessed to him while both were in custody.

Findings of Fact

Ronald Holloway met the defendant Tucker and the two became friends some years ago when both were serving prison terms for murder. They met again in 1992, while each was incarcerated at Rikers Island. At that time, in accordance with Mr. Holloway’s testimony at trial, defendant Tucker discussed the events giving rise to his previous conviction in the context of defendant Tucker’s successful appeal and preparation for a new trial. The discussions included admissions by defendant Tucker that he had participated in the crimes of which he had been convicted. Following a fight between them, Mr. Holloway called Detective Robert Salem and stated that he had information about defendant Tucker. This led to a meeting on July 23, 1992 with Assistant District Attorney Barry Temkin, the prosecutor assigned to defendant Tucker’s retrial. At that meeting Mr. Holloway stated that defendant Tucker had confessed his guilt to him and a long interview — which was tape recorded — ensued. The entire interview — during which Mr. Holloway was placed under oath — was held in the presence of Detective Salem and his partner, a detective named McNally, and neither left the room at any time during the interview. The entire interview was recorded, the tape was in no way manipulated or altered, and at no time did Mr. Temkin coach Mr. Holloway or tell him what to say.
During the interview, Mr. Holloway informed Assistant District Attorney Temkin of several details concerning the manner in which the crimes had been committed — details *5 obtained by Mr. Holloway from defendant Tucker — of which Mr. Temkin had been previously unaware. Mr. Temkin concluded that Mr. Holloway’s testimony would be useful at trial and agreed — in return for his testimony — to make a favorable recommendation concerning prompt parole as soon as Mr. Holloway became eligible and to recommend transfer of Mr. Holloway to one of several institutions where Mr. Holloway would be less likely to suffer retribution at the hands of defendant or his friends.
In a letter written at the court’s direction on October 2, 1992 (copy to defendant’s attorney), Assistant District Attorney Barry Temkin stated the promises made to Mr. Holloway in return for his testimony. The promises included making "a favorable recommendation to the appropriate authorities, agencies, courts and boards”. The letter further noted that "the prosecution has agreed to make and has in fact made a recommendation to the Department of Corrections consistent with the security of the witness”.
Thereafter, on February 9, 1993, Mr. Holloway was charged with infractions of Department of Correction’s rules, including: disrespect of staff, refusing a direct order, and refusing to identify himself. After a hearing held on February 11, 1993, Mr. Holloway was found guilty and sentenced to 20 days of "central punitive segregation” — a punishment sometimes colloquially described as the "bing”.
Mr. Holloway did not serve his punishment time because he was moved to a mental observation unit on February 15, 1993 and remained there until March 11, 1993, with a brief interruption on March 10, 1993. An admission note by a psychiatrist in his medical record dated February 15, 1993 states that "patient was transferred from C-95 after a suicide attempt. Inmate was found with a sheet around his neck trying to tie it to light fixture. He stated, T have the right to take my life.’ Patient facing 20 days Bing time. Patient denies past psychiatric history”.
The diagnosis noted on the same date was that Mr. Holloway was alert and well-oriented, not psychotic, that he denied hallucinations or delusional thinking, that his concentration was good and his memory intact, that he had average intelligence and that he appeared manipulative. The doctor concluded that he suffered from "adjustment disorder, mixed features, a personality disorder, and left knee arthritis”. An interview note made on March 10, 1993, by "L. Sadowitz” states that Mr. Holloway had been referred "after hang-up attempt 2/15/93 in *6 C95 Pt. Was 'avoiding Bing time’ to work on case in Law Library. Pt. Is seeking 'an appeal with new evidence’. Dx. Axis I: Malingering.”
The records further show that Mr. Holloway was discharged from the psychiatric unit on March 10, 1993, called upon to begin serving his "bing time” on March 11, 1993 and falsely reported that he had swallowed batteries to "get out of it”. The record of March 11, 1993, further notes "no evidence of psychosis; insight and judgment adequate”. On March 12, 1993, three days before defendant’s trial began, he was transferred to the nonpsychiatric, general population at the Bronx House of Detention, where he remained until April 30, 1993.
In due course, pursuant to the agreement between him and the prosecution, Mr. Holloway testified at defendant’s second trial. The agreement was the one relating to prompt parole and transfer to a detention facility secure from retribution at defendant’s hands or at his direction. The agreement did not include a provision, as claimed by Mr. Holloway, that Assistant District Attorney Temkin would recommend Mr. Holloway’s "immediate release” or delivery to him of a free copy of his trial transcript. Nor did it include an understanding — as also claimed — that Mr. Holloway falsely testify in accordance with "coaching” by Assistant District Attorney Temkin as to "details” or any aspect of his testimony. Finally, Assistant District Attorney Temkin, unaware that Mr. Holloway had been the subject of psychiatric observation between February 15 and March 11, 1993, did not discuss that matter in any way with Mr. Holloway and therefore — contrary to Mr. Holloway’s assertion — gave no instructions to the effect that Mr. Holloway conceal it from the defense.
Mr. Holloway’s so-called suicide attempts were contrived efforts to avoid punishment for misconduct while in custody. At all times during Mr. Holloway’s psychiatric observation (Feb. 15 to Mar. 11,1993) through the conclusion of the trial, the records of that observation were in the possession of Montefiore Medical Center, Rikers Island Health Services. Throughout the trial, the facts concerning Mr. Holloway’s psychiatric observation — as well as the existence of the records thereof — were unknown to the prosecution and the defense was never informed of those facts or the existence of the records.
Subsequent to the trial, on April 22, 1993, Mr. Temkin wrote to an agent of the Department of Correctional Services requesting that Mr. Holloway be kept separate from the accomplice Michael Hodge, as well as from defendant Tucker and any *7 known associates of Mr. Tucker, asserting that Mr. Holloway had been threatened on several occasions by prisoners who were friends or associates of defendant. The letter listed seven "facilities” said to confine such prisoners and requested that Mr. Holloway not be placed in any of them. The same request— because of pending litigation — was made concerning an eighth facility as well. Finally, stating the opinion that Mr. Holloway had good rehabilitation potential, Mr. Temkin requested that Mr. Holloway’s request to be placed in the Otisville or Arthur Kill facility be granted.
Thereafter, on May 11 and August 16, 1993, Mr. Holloway wrote letters to Mr. Temkin and District Attorney Hynes, respectively, evincing anger and frustration at Mr. Temkin and the District Attorney’s office generally. The first stated that — confined as he was at "Sing Sing” — he was in great danger at the hands of friends of defendant and he threatened "to resort to other methods” if Mr. Temkin did not help. Soon thereafter, on May 19, 1993, Mr. Temkin wrote to the Commissioner of Correctional Services and sent a copy to Mr. Holloway. In the letter, Mr. Temkin stated that Mr. Holloway had testified against defendant, that defendant had again been convicted and that — in Mr. Temkin’s opinion — Mr. Holloway had good rehabilitation potential. He requested that "appropriate security arrangements” be made for Mr. Holloway, that he be kept separate from defendant and receive favorable consideration when he first became eligible for parole in May 2001. In his letter of August 16,1993, Mr. Holloway complained directly to Mr. Hynes that Mr. Temkin had failed to have him transferred to an institution beyond the reach of defendant’s friends, that he was in great danger where he was and he again threatened to "resort to other methods” unless he received satisfaction.
During the summer of 1993, Mr. Temkin also supplied Mr. Holloway with a free copy of the transcript of Mr. Holloway’s trial — a copy which Assistant District Attorney Temkin had received from the Office of the Bronx County District Attorney while Mr, Temkin was preparing for trial. The copy was delivered to Mr. Holloway after Mr. Temkin had been informed that the Bronx County District Attorney did not want it back and not pursuant to any promise made to Mr. Holloway.
Mr. Holloway followed through on his threats to "resort to other methods” by providing defendant Tucker with an affidavit sworn to on June 20, 1994, recanting the testimony given by Mr. Holloway at trial. That recantation, as well as Mr. Hoi *8 loway’s claims of undisclosed promises and subornation of perjury by the prosecution, are not credited in any respect. Instead, they suggest an effort to ingratiate himself with defendant and his threatening friends or an effort to punish the prosecution for not arranging his transfer to a desired institution, or both. Conversely, the evidence establishes that the only promises made to Mr. Holloway were those set forth in Assistant District Attorney Temkin’s letter of October 2, 1993, and that Assistant District Attorney Temkin and Detective Salem engaged in no misconduct, either by commission or omission.
The prosecution has never had possession of the audiotape describing the autopsy of the deceased in this case. The tape has remained at all times in the possession of the New York City Medical Examiner.
Lastly, at defendant’s trial the prosecution presented the testimony of two civilian witnesses, who had also testified at defendant’s first trial, and each identified defendant as an active participant in the murder. The accomplice Michael Hodge, who had not previously testified, also identified the defendant as a participant. None of these witnesses has recanted his testimony.

The Law

1. The witness Holloway’s recantation and claims of prosecutorial misconduct.
As noted above, the testimony of Mr. Temkin was credible — and credited — in all important respects. The testimony of Mr. Holloway, on the other hand, was implausible in the-extreme and incredible in all important respects, with particular reference to his assertions claiming falsity of his testimony at trial, as well as subornation of perjury and undisclosed promises on the part of the prosecutor. The motion, insofar as it is based upon those claims, is therefore without merit. (See, People v Shilitano, 218 NY 161 [1916].) The issue concerning the psychiatric observation contrived by Mr. Holloway to avoid punishment for his misconduct requires separate consideration.
2. The Brady issue regarding witness Holloway’s psychiatric treatment and confinement immediately prior to his testimony.
It is true that evidence that a witness has received psychiatric treatment can be properly received on cross-examination to impeach credibility. (See, People v Rivera, 138 AD2d 169, 175 [1st Dept 1988]; People v Maynard, 80 Misc 2d 279 [Sup Ct, NY County 1974].) It is further true that suppression by the prose *9 cution of such evidence after a demand for disclosure violates due process when the evidence is material. (See, Brady v Maryland, 373 US 83, 87, supra; Giglio v United States, 405 US 150 [1972]; People v Consolazio, 40 NY2d 446 [1976]; People v Vilardi, 76 NY2d 67 [1990].) The difficulty with defendant’s contention is that the evidence demonstrates neither suppression nor that the evidence as to Mr. Holloway was material.
In the first instance, there is no suppression when the prosecution does not have possession of the evidence in question, actually or constructively. (See, United States v Bibby, 752 F2d 1116 [6th Cir 1985], cert denied 475 US 1010 [1986]; United States v Escobar, 674 F2d 469, 479 [5th Cir 1982].) As previously noted, the evidence presented here mandates the conclusion that the prosecution did not have actual possession or knowledge of the information. Further, the circumstances exclude constructive possession, as well. While the prosecution concededly did not ask the witness Holloway whether he had any psychiatric history, the prosecution has no affirmative duty to inquire concerning any psychiatric history of its witnesses. (See, People v Diaz, 134 AD2d 445 [2d Dept 1987], appeal denied 71 NY2d 895 [1988]; cf., CPL 240.45 [1].)* Nor has any authority been submitted or found to the effect that a demand or motion for discovery by a defendant concerning psychiatric treatment of a witness triggers any such duty.
In People v Haley (199 AD2d 863 [3d Dept 1993]) the prosecutor voluntarily conducted such an inquiry, but nowhere did the Court state that there was a duty to do so. In that case — one ending in convictions of rape and sodomy — the defense attorney sent the prosecutor a letter referring to information that complainant " 'may have been treated for a mental, physical, or emotional condition prior to the crimes’ ” and requesting such history. (Supra, at 864.) The prosecutor voluntarily inquired, discovered no treatment, and so stated. On appeal, defendant — who had been aware that complainant was receiv *10 ing supplemental security income (SSI) — complained of the prosecutor’s failure to discover an evaluation required as part of complainant’s application for SSL The Court affirmed the conviction, noting that the inquiry did not reveal the SSI evaluation, that the prosecution "did not withhold information”, and that the lower court had properly denied defendant’s motion for a mistrial in the absence of any showing that "the People withheld evidence”. (Supra.)
The Court noted approvingly that the prosecutor had responded to defense counsel’s letter, but — as noted above— nowhere was it suggested that a duty existed beyond the well-established duty not to withhold such information after the prosecution has, in fact, acquired it. (See, e.g., Giglio v United States, 405 US 150, 154, supra; People v Cwikla, 46 NY2d 434, 441 [1979].)
Nor, it is suggested, would it be good policy to postulate or create such a duty. There is a material and healthy tension between advocates in an adversary system of justice. To permit one to draft the other as an agent for investigation would create manifest conflicts of interest, invite inappropriate and unreasonable demands for investigation and — at least occasionally — foster compliance that is grudging and halfhearted. It would also create suspicion that compliance was halfhearted even when it was not, and an incentive for never-ending complaints about the manner in which the investigation had been conducted.
It is true that possession of information or records by a different agency has, on occasion, been imputed to the prosecution. (See, e.g., People v Vilardi, 76 NY2d 67, supra [information possessed by police]; People v Novoa, 70 NY2d 490 [1987] [information possessed by different New York prosecutor].) But material in the possession of agencies other than the police or a prosecutor has not been imputed to the prosecution. (See, e.g., People v Washington, 86 NY2d 189 [1995] [Medical Examiner’s records]; People v Johnson, 195 AD2d 481 [2d Dept 1993], appeal denied 82 NY2d 850 [1993] [memo books of private security guards]; People v Starke, 159 AD2d 405 [1st Dept 1990] [nurse’s report from a municipal hospital]; Matter of Sabol v People, 203 AD2d 369 [2d Dept 1994] [confidential social services records]; People v Yu, 166 AD2d 249 [1st Dept 1990] [complainant’s attorney’s file in separate civil action].) Indeed, there is authority for the proposition that even records in the possession of the police will not be imputed to the prosecution when they are privileged. (See, People v Fappiano, 134 Misc 2d *11 693 [Sup Ct, Kings County 1987], affd 139 AD2d 524 [2d Dept 1988] [confidential police psychologist’s file].) The records in this case concerning the conduct and psychiatric evaluation of Mr. Holloway were also arguably confidential. (See, People v Fappiano, supra.) More important, however, they were plainly not in the hands of an investigative agency and, in light of the authorities cited above, just as plainly fall into the nonimputable category. (Cf., People v Washington, supra.)
Further, even if possession were to be imputed to the prosecution, the evidence could not be properly viewed as material in any event. (See, People v Vilardi, supra.) In that case the Court of Appeals held that there must be a " 'reasonable possibility’ ” that the failure to disclose "contributed to the verdict” after the prosecutor has been made aware by a specific discovery request that defendant considered the information important. (Supra, at 77.)
While a specific discovery request was made in this case, it borders on the inconceivable that knowledge of Mr. Holloway’s psychiatric observation on the part of defendant would have resulted in a more favorable verdict. The history presented by the records in question had little impeachment value compared to the criminal history of the witness, which was disclosed. Indeed, the diagnosis "malingering” would probably have had greater impact than the contrived "suicide attempt”, especially in light of the finding that Mr. Holloway was not psychotic, not delusional and had an intact memory. (See, People v Knowell, 127 AD2d 794 [2d Dept 1987]; People v Walker, 116 AD2d 948, 951 [3d Dept 1986]; People v Sims, 167 AD2d 952 [4th Dept 1990]; see also, People v Maynard, 80 Misc 2d 279, supra.)
Further, defendant was convicted after the first trial on the testimony of only two witnesses, without the testimony of the codefendant Hodge. On appeal, the Appellate Division found the evidence sufficient to support the verdict. At the second trial, Mr. Hodge’s testimony added substantial weight to that of the two original witnesses. Thus, even if the testimony of Mr. Holloway were to have been neutralized entirely the result, quite certainly, would have been the same.
3. The Rosario claim as to the Medical Examiner’s autopsy tape.
As noted above, defendant further urges that the prosecutor violated the rule spelled out in People v Rosario (9 NY2d 286 [1961]) by failing to deliver an audiotape in which the pathologist-witness described the autopsy. While it appears *12 that a Medical Examiner’s autopsy audiotape relating to the deceased does exist, the prosecution never possessed it. It is settled that such material never in the possession of the prosecution does not constitute Rosario material. (See, People v Washington, 86 NY2d 189, supra.)
Accordingly, defendant’s motion is denied in all respects.

 It is true that Justice Souter, writing for the majority in Kyles v Whitley (514 US 419, 437), remarked that "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government’s behalf in the case, including the police.” But that case involved the failure of the prosecution to inform the defense of evidence favorable to defendant which was known to the police and not known to the prosecutor. In context, it is clear that the comment simply refers to the well-settled proposition, noted below, that possession of information or records by the police or another prosecutor will be imputed to the prosecution and was not meant to suggest that the same is true concerning information possessed by any person who happens to be a prosecution witness.